**NEW ORLEANS SAINTS and John W. Mecom, Jr.**

v.

**Alvin GRIESEDIECK, Jr. and Falstaff Brewing Corporation.**

**Civ. A. No. 82–2950.**

United States District Court,
E.D. Louisiana.

May 17, 1985.

the "right of first refusal clause" breached an implied resolutory condition which dissolves the sale of the 2% interest to Griesedieck.

Defendants' claim Griesedieck at all times held the interest as nominee for Falstaff, which plaintiffs knew, that the "transfer" to Kalmanovitz did not work any change in ownership and therefore did not violate the partnership agreement.

The essential disputes in this case are factual. The critical issue is: did Alvin Griesedieck originally purchase the 2% interest in the Saints for himself or for Falstaff Brewing Corporation with the interest simply placed in his name. If Griesedieck purchased the interest for himself, then his subsequent transfer to Kalmanovitz as "trustee" for Falstaff without first offering the interest to the 50% partner violated the partnership agreement. Of course, if Falstaff in fact owned the interest, there was no subsequent transfer. In order to resolve this issue, the Court determines whether or not the partnership and Mecom knew, as Griesedieck claims, that Griesedieck was only a nominee, and that Falstaff owned the interest at all times.

I—Evidentiary Issues

In formulating its decision on this matter, it is necessary that the Court initially dispose of certain evidentiary objections interposed by the parties.

■ Plaintiffs sought to introduce portions of the deposition of Walter S. McIlhenny, (P–18) who did not testify at trial, on the ground that Mr. McIlhenny was either over 100 miles from the place of the trial, or he was unable to attend because of age, illness or infirmity. Fed.R.Civ.P. 32 (a)(3)(B) and (C). Plaintiffs aver Mr. McIlhenny lives 150 miles by road, and 102 miles by air from this Court. Whether the 100 miles distance is measured by road or air, as in *SCM Corp. v. Xerox Corporation*, 76 F.R.D. 214 (D.Conn.1977), Mr. McIlhenny lives more than 100 miles from the place of trial, and his deposition is admissible in lieu of his testimony. Fur-

Russell J. Schonekas, Tucker & Schonekas, and Catherine Maureen Blackburn, New Orleans, La., for New Orleans Saints.

Rutledge C. Clement, Jr., Fred D. Bentley, Jr., Phelps, Dunbar, Marks, Claverie & Sims, C. Scott Jackson, Harry S. Redmon, Jr., New Orleans, La., for defendants.

OPINION

ARCENEAUX, District Judge.

On February 25, 1982, Alvin ("Buddy") Griesedieck (Griesedieck), a 2% record partner in the New Orleans Saints professional football team (Saints or partnership) executed an instrument purporting to transfer his interest to Paul Kalmanovitz (Kalmanovitz) as Trustee for Falstaff Brewing Corporation (Falstaff). (P–16). Griesedieck declared in the transfer document that he held the interest as Trustee for Falstaff. Plaintiffs filed this suit alleging that the transfer violated the partnership agreement because Griesedieck did not first offer to sell his interest to the partner owning a 50% interest, John W. Mecom, Jr. (Mecom). Plaintiffs' claim the violation of

ther, the record reveals both parties have both sought and opposed the perpetuation of his testimony due to illness.

■ The affidavit of Mr. McIlhenny, (D–104) which contradicts his deposition, is inadmissible hearsay for which there is no exception to the extent it is used to prove the truth of the matters asserted in the affidavit. The affidavit is admissible to show deponent's prior inconsistent statement—not as substantive evidence, but to impeach the deponent. Fed.R.Evid. 801. The Court has limited its consideration of this exhibit to that purpose.

■ Plaintiffs contest the authenticity of exhibit D–96 which is an inter-office memorandum on Falstaff letterhead from Falstaff's president Ferd Gutting to its operations manager. (Griesedieck Tr. 301–304). Although Griesedieck could not identify the handwritten note at the bottom of the memorandum, the Court believes the memorandum is what defendants claim it to be; that is, a memorandum kept in the course of a regularly conducted business activity, and it is admissible. Fed.R.Evid. 803, 901.

■ Counsel for defendants proffered numerous exhibits subject to plaintiffs' objections of relevancy and parol evidence. (Tr. 305–307). The Court finds the exhibits are relevant and not barred by the parol evidence rule for the reasons stated below, and therefore admissible.

Plaintiffs object to any testimony indicating Griesedieck held the partnership interest as Falstaff's nominee as contrary to the Act of Sale and the Articles of Partnership and thus violative of the parol evidence rule. At the time of trial LSA–C.C. art. 2276 provided:

> Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.

There are numerous exceptions to the parol evidence rule, one of which is "to show that the writing is only a part of an entire oral contract between the parties". *Gulf States Finance Corporation v. Air-*line *Auto Sales, Inc.,* 248 La. 591, 181 So.2d 36 (1965); *Ferace v. Fullerton,* 425 So.2d 393 (La.App. 3rd Cir.1982). Plaintiffs and Falstaff orally agreed Falstaff would become a partner in the Saints, with Griesedieck as its representative and evidence directed to this issue is admissible.

Plaintiffs assert the attorney-client privilege with respect to three documents: 1) the minutes of a meeting of the Saints minority partners held on June 21, 1972 (D–2–C); 2) a letter from Kelleher to Mecom dated July 24, 1975 (D–29); and 3) a letter from Kelleher to Mecom dated July 16, 1975 (D–28).

In civil actions where state law supplies the rule of decision, privileges are to be determined in accordance with state law. Fed.R.Evid. 501. Louisiana's attorney-client privilege in civil matters is expressed in LSA–C.C. art. 2283 (repealed in 1984):

> No attorney or counsellor at law shall give evidence of anything that has been confided to him by his client, without the consent of such client. . . .

It has been said that this privilege is similar to that in most states. Pugh and McClelland, *Evidence, The Work of the Louisiana Appellate Courts, 1975–1976 Term,* 37 La.L.Rev. 575 (1977). Louisiana courts routinely cite common law authorities in discussing the privilege, *Succession of Norton,* 351 So.2d 107 (La.1977); *Tubesales v. Champion Machine Works, Inc.,* 281 So.2d 459 (La.App. 4th Cir.1973). Accordingly, decisions resting on common law principles are appropriate.

■ The relevant elements necessary to establish an attorney-client privilege are: 1) the asserted holder of the privilege is or sought to become a client; 2) the communication is made to an attorney or his subordinate, in his professional capacity; 3) the communication is made outside the presence of strangers; 4) for the purpose of obtaining an opinion on the law or legal services and 5) the privilege is not waived. *In Re Grand Jury Proceedings,* 517 F.2d 666 (5th Cir.1975) (citations omitted). What is "vital to the privilege is that the

communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer." United States v. El Paso Company*, 682 F.2d 530, 538 (5th Cir.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 1927, 80 L.Ed. 2d 473 (1984) (emphasis in original); *Tubesales*, 281 So.2d 459. The privilege may be waived by the failure to assert it at trial, *State v. Schmitt*, 354 So.2d 1339 (La.1978), or by the failure to claim it during discovery, *Perrignon v. Bergen Brunswig Corporation*, 77 F.R.D. 455 (N.D.Calif.1978).

The minority partners met on June 21, 1972, to discuss an offer to purchase their interests. All of the minority partners attended, as well as representatives for the prospective purchaser. (Griesedieck Tr. 231–233). The minutes reflect the presence of the purchaser representatives, George Gillette and Norman Waite. (D–2–6). Also at the meeting were counsel for the Saints partnership, Harry Kelleher (Kelleher) and Dando Cellini (Cellini). Cellini recorded the events of the meeting. (Cellini Tr. 194–195).

■ Assuming Kelleher and Cellini attended the partnership meeting for the purpose of rendering legal services, the presence of Gillette and Waite, who were neither partners nor clients, negate the confidential element of the meeting and its minutes. *United States v. Gordon Nikkar*, 518 F.2d 972 (5th Cir.1975).

■ Further, as defendants suggest, even if the minutes of the June 21, 1972 meeting were privileged, plaintiff waived the privilege by producing the minutes pursuant to a request for production of documents. *Perrignon*, 77 F.R.D. 455.

■ The letter from Kelleher to Mecom dated July 24, 1975 (D–29) reports to Mecom discussions Kelleher had with the minority partners, and a discussion with Griesedieck in which Griesedieck allegedly stated Falstaff had decided not to transfer

its interest to another nominee holder. The letter summarizes statements made by third persons to the partnership's attorney, and neither reveals any confidences of the client (the partnership) nor suggests a legal opinion. *In Re Sealed Case*, 737 F.2d 94 (D.C.Cir.1984).

■ The Court has closely examined the letter from Kelleher to Mecom dated July 16, 1975 (D–28) and finds it does not reveal any confidences of the partnership nor any legal opinions which have not already been aired at trial, and is admissible. The portion most damaging to plaintiffs is found in the first paragraph of page two of the letter, in which Kelleher states it is his best recollection the Executive Committee of the partnership knew for some time that Falstaff in fact owned the Griesedieck interest. This is his recollection not a confidential communication of the partnership. The fact that Kelleher may have acquired this information as counsel for the partnership does not make it confidential. Moreover, Falstaff's ownership was generally known to others besides the client. The rest of the letter concerns facts already in evidence without objection.[1]

## II—The Merits

In 1967, Mecom and a number of other persons formed a partnership to operate under the name the New Orleans Saints for the purpose of owning a National Football League (N.F.L.) franchise. (P–1). The partnership agreement was restated and amended several times (P–2—P–8), but the provisions of the agreement on which plaintiffs rely remained unchanged:

8. a. No partner, other than the partner owning more than 50% interest in the partnership ("50% interest partner") shall have the right to sell or transfer his interest in the partnership unless he sells his entire interest, and unless and until he shall have first offered it for sale to the 50% interest partner.

1. The foregoing discussion with regard to the admissibility of the allegedly privileged Kelleher-Mecom letter is in response to the evidentiary claims presented by defendants. However, the letter, even if not admissible, would not change the Court's factual findings in the light of other overwhelming evidence on the issue of Mecom's knowledge of Falstaff's ownership.

12. Any attempted sale of an interest in the partnership in violation of the provisions of these articles shall be null and void....

Since the formation of the Saints, Mecom has been the 50% interest partner, and at present he and his family own a 98% interest in the partnership. (Mecom Tr. 15).

In 1966, while preliminary discussions to introduce N.F.L. football to the New Orleans area were underway, Falstaff began to consider acquiring an interest in the Saints partnership, primarily to secure an advantageous marketing position. (Griesedieck Tr. 239; D–1–A). Griesedieck, then a Falstaff director and its marketing vice-president and later public relations director, sent several memoranda to Falstaff's president, his brother Joseph Griesedieck, concerning Falstaff's possible investment in the new team. (D–32, D–33).[2]

On January 17, 1968, Griesedieck met with Mecom and his representatives to discuss the conditions of Falstaff's possible purchase of a partnership interest. (Mecom Tr. 79, Griesedieck Tr. 241). Griesedieck memorialized the meeting in notes which reflect "[s]tock would be in my name, but paid for by the Corporation. Any profits or loss would affect Corporate P & L. Purchase of stock interest subject to our Board's approval." (D–2–A). At Falstaff's Board of Directors meeting on January 22, 1968, Griesedieck reported on the January 17 meeting, and the Board authorized an investment in the partnership of up to 4%. (Griesedieck Tr. 243; D–1–B, D–1–C).

At the time of Falstaff's proposed purchase of the partnership, the N.F.L. had an unwritten rule (sometimes referred to as the "Rozelle Rule") prohibiting publicly held corporations from owning an interest in an N.F.L. franchise. The rule's purpose was to avoid public disclosure of team financial information (e.g. player contracts) by prohibiting participation of publicly held corporations which filed financial reports with the Securities and Exchange Commission. (Schwenk Tr. 148–150; Griesedieck Tr. 246; Poitevent Tr. 461–463). Because of this rule, when Falstaff earlier acquired an interest in the St. Louis Cardinals football team, it was purchased in the name of Joseph Griesedieck, as nominee or representative for Falstaff. (Griesedieck Tr. 228, 246).

Victor Schwenk, who was associated with the embryonic Saints in 1966, and was the team general manager from 1968 to 1971, attended all of the league meetings and some of the executive committee meetings and heard informal discussions of the rule. Mecom attended some of these meetings. (Mecom Tr. 66–67). When Falstaff expressed an interest in the partnership, Schwenk advised Mecom he should not sell an interest to a corporation. Schwenk believed it was commonly known that the rule caused Falstaff to purchase the Saints' partnership interest in Griesedieck's name. (Schwenk Tr. 149–152). Edward Poitevent (Poitevent), a minority partner and at one time counsel for the partnership, learned of the rule directly from Pete Rozelle and he assumed Mecom knew of it. (Poitevent Tr. 461–462). To comply with this rule, Arthur Palmer, Mecom's financial advisor, suggested Griesedieck purchase the partnership interest in his own name as nominee for Falstaff. (Griesedieck Tr. 246).

On January 23, 1968, the day after the Falstaff Board authorized investment in the partnership, Griesedieck wrote to Pete Rozelle the Commissioner of the N.F.L., requesting his approval of Falstaff's participation as a minority partner, with Griesedieck "... acting as nominee for the Corporation...." Mr. Rozelle answered he saw "no major problems arising from the proposed Saints stock transfer to Falstaff as you outlined it." (D–5, D–6).

Mecom testified he did not know of an unwritten rule that publicly held corporations could not own part of a franchise, and he could not recall having any discussions

---

**2.** Falstaff was essentially a family corporation at this time. Although publicly traded, the Griesedieck family controlled its stock.

to that effect. (Tr. 67–70). Nor did he recall Victor Schwenk telling him they could comply with the rule by putting Falstaff's interest in the name of Alvin Griesedieck, Jr. (Mecom Tr. 70). In the face of overwhelming evidence the Court finds Mecom knew of this unwritten rule and the rule corroborates defendants' claim.

On February 7, 1968, Griesedieck wrote to Mecom's financial advisor Arthur Palmer that Falstaff would not invest in the Saints, but he would consider a personal investment in a 2% interest. (P–11). Robert McMurrey, attorney for Mecom, responded with an offer to sell to Griesedieck individually and Griesedieck accepted the offer. (P–12). By act of sale dated February 15, 1968, Griesedieck, with no qualifying title to indicate his nominee status, purchased a 2% interest in the partnership (P–13) and the articles of partnership were amended accordingly. (P–4).

Plaintiffs introduced Exhibits P–11 and P–12 to show Griesedieck invested in the Saints on his own behalf. However, the Court finds Griesedieck's testimony believable, consistent with both prior and subsequent documentation, and accepts his testimony that his February 7 letter was to create the appearance of an individual purchase in compliance with the Rozelle rule. (Griesedieck Tr. 251–255). This finding is further supported by Griesedieck's letter to Robert McMurrey (and copied to Arthur Palmer) enclosing his acceptance (P–12) dated February 19, 1968, stating "I assume you are aware that this interest will be in my name but the ownership will be that of Falstaff Brewing Corporation" (D–7). Neither McMurrey nor Mecom contacted Griesedieck regarding this statement. (Griesedieck Tr. 246–247).

On February 26, 1968, Griesedieck reported to the Falstaff Board of Directors that "we had taken a 2% interest" in the Saints as authorized at the prior meeting. (D–1–D). The initial payment for the partnership and all subsequent partnership "calls" or contributions attributable to the disputed interest were made by Falstaff checks. (Mecom Tr. 86–87; Griesedieck Tr.

255–258; D–8, D–15). The partnership issued checks to Griesedieck which he endorsed to Falstaff. (D–24, D–25, D–25A, D–30; Griesedieck Tr. 286–289). Although the partnership tax returns listed Griesedieck as a partner (P–14), Falstaff, not Griesedieck, claimed the partnership profits and losses. (Griesedieck Tr. 276, 282–286; D–112, D–113, D–4). The many documents introduced by defendants show the partnership, through its then business manager, Eddie J. Jones, and accountants, communicated directly with Falstaff's tax advisors, accountants and attorneys.

There is specific documentation showing that both the partnership and Mecom were well aware that Griesedieck held the 2% interest as nominee for Falstaff. On April 18, 1972, Mecom, Griesedieck and others held a partnership meeting, at which they discussed which partner should protest an Internal Revenue Service finding relating to player inventory amortization. The minutes state:

*Mr. Griesedieck suggested that since Falstaff was audited each year in any case that it might be willing to so file.* However, Mr. Kelleher noted that in all likelihood Falstaff has no Louisiana tax jurisdiction and might be examined in another district. Since it is important that the return be examined in this district by the same examiner who reviewed the Atlanta and Miami returns, *some other partner would have to be chosen.*

(D–2–B). (Emphasis added). Mecom testified he assumed the minutes were accurate but that he could not recall the meeting, or Griesedieck's statement, and he "doubt[ed] seriously if [he] ever discussed anything with Mr. Griesedieck concerning Falstaff." (Tr. 30–31).

As counsel for the partnership, Cellini memorialized the events of a meeting held on June 21, 1973, attended by the minority partners, including Poitevent (D–2–C). Cellini and Griesedieck believed the memorandum accurately described the events of the meeting. (Cellini Tr. 190–193, 205–206; Griesedieck Tr. 234). The purpose of the meeting was to discuss an offer to pur-

chase the New Orleans Saints. The memorandum reflects:

> Mr. Griesedieck stated that his interest in the Saints partnership is in reality owned by the Falstaff Brewing Company, but he foresaw no difficulty in being able to come to a decision on whether or not the interest should be sold by Monday, since a board meeting of the Falstaff Brewing Company was scheduled for Monday.

The memorandum is addressed to Mecom and Richard Gordon, Jr., the Saints' general manager, and Cellini assumed he sent the memorandum to Mecom and Gordon as his routine practice. (Cellini Tr. 193, 204–205). Cellini testified Griesedieck's statement regarding Falstaff's ownership "did not come as a surprise to me." (Cellini Tr. 209). Mecom read the memorandum when he received it in 1973. (Mecom Tr. 134).

In 1975 the Griesediecks sold the controlling interest in Falstaff and the new owners asked Griesedieck to resign as representative of Falstaff's interest. Griesedieck sent a letter to Mecom dated July 7, 1975, stating in part:

> Per our conversation, I am writing to advise that, effective immediately, I am resigning from the Executive Committee of the Saints partnership....
>
> The new management of the Falstaff Brewing Corporation desires to have the company interest represented by Lawrence Gregg....

(D–27). Mecom remembered this letter and asked his attorney, Harry Kelleher, to respond and he was "sure there was a communication back to [Griesedieck]", (Mecom Tr. 22–24, 41–42) but plaintiffs failed to produce a communication disputing Falstaff's ownership.

To the contrary, on July 16, 1975, Kelleher wrote to Mecom and Richard Gordon referencing Griesedieck's July 7 letter, and noted that although the documents showed Griesedieck to be the record owner, it was his "best recollection that ... the Executive Committee of the Saints' partnership has been aware for some while past that the Griesedieck interest was in fact owned by Falstaff Brewing Corporation." (D–28).

By letter dated July 24, 1975, Mr. Kelleher related his conversation with Griesedieck to Mecom, in which Griesedieck apparently referred to "the minority interest in the New Orleans Saints standing in his name, of which the Falstaff Brewing Company is the beneficial owner." (D–29).

On September 10, 1976, Russell Schonekas, acting as Mecom's attorney, advised Griesedieck that Mecom wished to "purchase your minority interest in the New Orleans Saints Partnership that you represent...." Griesedieck responded "we have no interest in selling the 2% minority interest ... as outlined in your letter." (D–99) At the same time Griesedieck wrote to Mecom explaining that the controlling interest in Falstaff was now owned by Paul Kalmanovitz who had no interest in selling at that time. (D–106).

The Court is unable to accept Mecom's testimony; the evidence is compelling that he must have known of Falstaff's ownership. For example, Mecom testified he did not know Griesedieck claimed to be Falstaff's nominee until the filing of this lawsuit in 1982. He then remembered receiving a letter in 1975 or 1976 (D–27), which he gave to his attorney to answer, in which Griesedieck stated Falstaff wished the company interest to be represented by Lawrence Gregg, "a resident of New Orleans and employee of the company." (Mecom Tr. 21–24). With regard to Kelleher's letter of July 16, 1975, in which Kelleher recalled the Executive Committee of the partnership knew Falstaff in fact owned the interest, Mecom testified it did not matter to him that Falstaff claimed to be the owner because he still looked to Griesedieck as his partner. (Mecom Tr. 52–53).

Mecom was at best uncertain in his testimony regarding discussions with Griesedieck about Falstaff becoming a partner (Mecom Tr. 74–80), and regarding the letters from his attorney Russell Schonekas and from Griesedieck, which indicate Falstaff owned the interest (D–99). Mecom did not think he received the letter from

Griesedieck stating Kalmanovitz did not wish to sell Falstaff's interest (D–106) or the letter enclosing a request from Kalmanovitz to transfer the stock in the Saints (D–108), even though the letters were addressed to his apartment, where he routinely received other correspondence. (Mecom Tr. 122–124). As previously noted, Mecom also denied knowledge of the "Rozelle Rule", even though his general manager, attorneys and partners knew the rule.

Two former partners supported Mecom's claim. Walter S. McIlhenny stated in his deposition that he thought Griesedieck was purchasing the interest for himself. (McIlhenny Depo. 9–10) This contradicted his previously executed affidavit (D–104) in which he acknowledged Falstaff was a partner and Griesedieck its nominee. Poitevent testified he never heard Griesedieck's participation as being other than as an individual partner (Poitevent Tr. 438, 440, 443), and to the extent he heard Griesedieck indicate his nominee status he apparently disregarded such statements as having no significance and contrary to law. (Poitevent Tr. 453, 469).

Considering all of the evidence, the Court concludes Mecom—indeed, all of the Saints partners knew of, and consented to, Falstaff's partnership interest and its representation by Griesedieck.

### III

■ Plaintiffs seek dissolution of the sale of the partnership interest to Griesedieck on the theory that Griesedieck breached a resolutory condition requiring a partner to first offer to sell his interest to the majority partner when Griesedieck transferred his 2% interest to Kalmanovitz. Because I find Falstaff is and has always been the owner of the 2% interest, the transfer of the Falstaff interest from Griesedieck, as nominee, to Kalmanovitz, as nominee, was not a violation of a condition of the partnership agreement. *Blum v. Latter*, 163 So.2d 189 (La.App. 4th Cir. 1964). Although *Blum* involved an interest in a corporation, not a partnership, the

principle of law enunciated therein is equally applicable to the instant case.

■ Even if Griesedieck owned the interest and sold it, the provision giving the majority partner a right of first refusal is not a resolutory condition. A resolutory condition is implied in all commutative contracts, such as the articles of partnership herein, "to take effect, in case either of the parties do not comply with his engagements...." LSA–C.C. arts. 2046, 1768. The complaining party must sue for dissolution, or if appropriate, specific performance. LSA–C.C. art 2046. In a suit for dissolution, the Court has discretion to determine "whether the performance not rendered by defendant was the cause of plaintiff's obligation, in which case dissolution must be granted, or whether the failure in defendant's performance is not so grave as to have deterred plaintiff from entering the contract, had he foreseen it, in which case he will be granted damages or a proportional reduction of his own performance." S. Litvinoff, 7 Louisiana Civil Law Treatise, 2 Obligations § 272 at 514 (1975); *Makofsky v. Cunningham*, 576 F.2d 1223, 1232 (5th Cir. 1978).

Mecom testified he sold the 2% interest in the partnership in part to raise capital, in part because "[he] didn't feel [he] needed to be a hundred percent owner at that time" and because "[he] really didn't mind having local people involved with [him] or whomever else wanted to get involved that was a sportsman...."

The testimony does not justify a conclusion that Mecom's "cause" or reason for selling the partnership interest to Griesedieck was his right of first refusal. I find this right to be merely an ancillary obligation. *Makofsky*, 576 F.2d 1223.

■ Further, the partnership agreement provided that an "attempted sale in violation of the provisions of these articles (the right of first refusal) shall be null and void...." (P–1, P–2, P–8). Counsel for the partnership wrote the articles (Poitevent Tr. 434) with this provision in Mecom's favor, presumably with Mecom's approval, or at least with his acquiscence. From the

terms of the agreement expressing Mecom's intent, the Court finds Griesedieck's alleged violation of the condition was "not so grave as to have deterred plaintiff from entering the contract, had he foreseen it" and thus is not a resolutory condition.

In addition, the partnership articles stipulate the remedy in the event of an attempted transfer. If the Court had found a transfer from Griesedieck to Kalmanovitz, the partnership's and majority partner's remedy is to have the transfer declared null and void.

In summary, the Court finds: 1) Griesedieck acquired the interest in the Saints partnership as the nominee of Falstaff; 2) his status as a nominee was known to Mecom, the partnership and the other Saints' partners, in accordance with prior understandings and arrangements with them; 3) the "transfer" from Griesedieck, as Falstaff nominee, to Kalmanovitz as Falstaff nominee, was not a "sale of an interest", prohibited by Article 8 of the Saints partnership agreement.

Accordingly,

IT IS ORDERED that judgment be entered in favor of defendants Alvin Griesedieck, Jr. and Falstaff Brewing Corporation, and against plaintiffs the New Orleans Saints and John W. Mecom, Jr., dismissing plaintiffs' claims, plaintiffs to bear all costs of these proceedings.