499 So.2d 709 (1986)
STATE of Louisiana, Plaintiff-Appellee,
v.
Joan Dugas Guidry MONTGOMERY, Defendant-Appellant.
No. CR 86-103.
Court of Appeal of Louisiana, Third Circuit.
December 10, 1986.
Stay Order Recalled; Writ Denied February 20, 1987.
*711 Cecilia A. Bonin, New Iberia, Julie E. Cullen, Opelousas, for defendant-appellant.
Michael Harson, Donald Landry, Asst. Dist. Attys., Lafayette, for plaintiff-appellee.
Before LABORDE, KNOLL and KING, JJ.
LABORDE, Judge.
On December 31, 1983, Dr. J. Boring Montgomery was shot. The only persons present at the time of the shooting were the doctor and his wife, Mrs. Joan Dugas Montgomery. Mrs. Montgomery was indicted for the second degree murder of her husband, a violation of La.R.S. 14:30.1.
On July 30, 1985, she stood trial on that charge. After a five day trial, a jury by 11 to 1 found her guilty of manslaughter. She is presently incarcerated serving a sentence of ten years at hard labor, enhanced by two years under La.R.S. 14:95.2. She is before this court on appeal from the verdict and sentence in that case.

ASSIGNMENTS OF ERROR NOS. 1, 2, 3, 5 AND 9
These assignments of error were neither briefed nor argued. Therefore, they are considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982).

ASSIGNMENT OF ERROR NO. 4
Appellant claims the trial court erred in allowing the testimony of Margi Chadulla, an employee of the answering service under contract with Mrs. Montgomery's friend and attorney, William Lambert. Appellant contends that Mrs. Chadulla's testimony should have fallen within the attorney-client privilege since Mrs. Chadulla was an agent of Mr. Lambert by reason of her employment with Mr. Lambert's answering service.
There is no Louisiana authority for the proposition that agents of an attorney fall within the attorney-client privilege. However, in analyzing the attorney-client privilege, Louisiana courts have relied on common law authorities. New Orleans Saints v. Griesedieck, 612 F.Supp. 59 (E.D.La. 1985), affirmed, 790 F.2d 1249 (5th Cir. 1986); State v. Rankin, 465 So.2d 679 (La. 1985); Succession of Norton, 351 So.2d 107 (La.1977). Some common law states provide by statute that agents of an attorney fall within the privilege. See, eg. Cal Evid. Code sec. 952; Colo.R.S. XX-XX-XXX; Fla.Stat.R.Cr.P. Rule 3.216(a); Minn.Stat. Ann. sec. 595.02. Many other states, although not having a specific statute dealing with agents of the attorney, have expanded their general attorney-client privilege to include agents. Other jurisdictions have concluded that for the attorney-client privilege to apply, the communication must have been made to an attorney, or his agent, while seeking legal advice or representation and must have been intended as confidential. When the communication is made in the presence of third parties, the intent of confidentiality is generally lacking.
If a third party's presence is required for the transmission of the information and the client had a reasonable expectation of confidentiality, the privilege will not be lost. McCORMICK EVIDENCE HORNBOOK sec. 91 (2d Ed., 1972).
"It has never been questioned that the privilege protects communications to the attorney's clerks and his other agents (including stenographers) for rendering his services. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents."
8 WIGMORE, EVIDENCE sec. 2301 (McNaughten Rev.1961). Whether the presence of a third party will destroy the privilege depends on the identity of the third party and whether the client could *712 reasonably have believed the communication would remain confidential.
In Asbury v. Beerbower, 589 S.W.2d 216 (Ky.1979), a report made by an insured to his insurance company concerning an event which was the basis of the claim against the insured was held to fall within the attorney-client privilege. The court noted that the insured had an obligation to cooperate with the insurer who was expected to provide an attorney. Thus, the court found that the insurer was acting as an attorney's agent.
In State v. Pavin, 202 N.J.Super. 255, 494 A.2d 834 (1985), the court found that under the circumstances a report made to an insurer did not fall within the attorney client privilege. The court held that the privilege should be held to shield communications between the insured and the adjuster only where the communications were in fact made to the adjuster for the dominant purpose of the defense of the insured by an attorney and where confidentiality was the reasonable expectation of the insured. The court found that the insured was interviewed before the criminal litigation had commenced and that the adjuster was not acting on an attorney's instructions. Thus, the court held the privilege did not apply.
In Brown v. State, 448 N.E.2d 10, 14 (Ind.1983), the court held:
"The attorney-client privilege is recognized as attaching to communications between the agent of an attorney and the client, provided the communication is made to the agent upon the same subject matter about which the attorney was consulted and the agent was retained by the attorney for the purpose of assisting him and rendering legal advice to or conducting litigation on behalf of the client."
In Brown, statements made by the defendant to a polygraph examiner hired by defendant's attorney were held to fall within the privilege.
In People v. Knippenburg, 66 Ill.2d 276, 6 Ill.Dec. 46, 362 N.E.2d 681 (1977), statements made by a defendant to an investigator hired by defendant's attorney were held to be privileged. In Taylor v. Taylor, 179 Ga. 691, 177 S.E. 582 (1934), the court held that the privilege applied to an attorney's confidential secretary who was present during discussions with the client.
Louisiana recognizes an attorney-client privilege over communications made by a person to his attorney when the attorney received the communication by reason of his being a legal advisor. LSA-R.S. 15:475. In New Orleans Saints v. Griesedieck, 612 F.Supp. at 62, the court listed the following elements for determining whether the attorney-client privilege should apply: 1) the asserted holder of the privilege is or sought to become a client; 2) communication is made to an attorney or his subordinate, in his professional capacity; 3) communication is made outside the presence of strangers; 4) for the purpose of obtaining an opinion on the law or legal services; and 5) the privilege is not waived. What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. We determine that Griesedieck sets forth the proper Louisiana standard of attorney-client privilege applied to agents.
In the instant case, Ms. Chadulla worked for the answering service which Mr. Lambert used. Mr. Lambert's instructions to the answering service were to take down the name of the person calling and the subject matter of the call. Ms. Chadulla testified that when she asked defendant what the call was about, the defendant replied "I shot my husband." Ms. Chadulla immediately relayed the message and patched the call through to Mr. Lambert. The trial judge held the privilege would apply to all statements made by defendant to Mr. Lambert but not to the statements made to Ms. Chadulla.
One might assume that the call defendant made to Mr. Lambert was made for the purpose of obtaining legal services since he acted as her criminal attorney until Ms. Bonin was retained; however, defendant testified that she called Mr. Lambert for help because he was a friend.

*713 "[Ms. Bonin] Q. Did you call anybody at all?
[Defendant] A. I'm not sure what I did, but I did call for help.
Q. Who did you call?
A. I got Bill Lambert on the phone.
Q. All Right, now isn't Bill Lambert an attorney in town?
A. He was our friend.
Q. All right, but isn't he an attorney here in town?
A. Yes, Ma'am, he is.
Q. Okay. Why did you call Bill Lambert?
A. Because I didn't know who to call. I didn't know the numbers to all the other places I was supposed to call, and I don't know that I could have dialed it [sic]."
Defendant's attorney repeated the question later in trial:
"[Ms. Bonin] Q. Why again did you call Bill Lambert?
[Defendant] A. He was our friend.
Q. All Right, did you have any other reason for calling Bill Lambert?
A. No, ma'am."
The foregoing testimony indicates that Mr. Lambert was called in his capacity as a friend, not an attorney. The attorney-client privilege is not applicable to Mr. Lambert's testimony nor to Ms. Chadulla's under LSA-R.S. 15:475 as we find that this communication was not made to Mr. Lambert in his professional capacity. Not all of the elements listed in Griesedieck were present(2) the communication was not made to Mr. Lambert in his professional capacity. We find no error in admitting the testimony of Ms. Chadulla. This interpretation is all the more convincing in light of defendant's next communication to Mrs. Lucille Woody, another friend.
Ms. Woody is a neighbor and friend of defendant. On the night of the incident, after having called Mr. Lambert, defendant phoned Ms. Woody stating "Miss Lou, I just shot Doc." This testimony was not objected to and is virtually identical to what the jury heard from Ms. Chadulla.
Therefore, even if it were error for the trial court to admit the testimony of Ms. Chadulla, defendant was not prejudiced. An error without prejudice to defendant is not reversible. La.C.Cr.P. art. 921.

ASSIGNMENTS OF ERROR NOS. 6 AND 10
The appellant claims the trial court erred in permitting the prosecution to read, during Ms. Lucille Woody's testimony and during closing arguments, from a statement given by Ms. Woody to the police. Appellant contends the testimony should have been elicited from Ms. Woody rather than read by the prosecution from the transcribed statement. By allowing the prosecution to read from the statement, the court allowed inadmissible evidence, not subject to cross-examination to reach the jury.
There are two ways this statement could have been entered into the evidence: 1) past recollection recorded, and 2) as a prior inconsistent statement. Another exception, present recollection refreshed, allows a witness who has difficulty remembering that about which he is testifying to review a memorandum or other documents which the witness made when he had a better memory of the event. The witness then testifies from his memory. The documents themselves are not entered into evidence under the last exception.
If after reviewing his previous statements, the witness still has no present recollection of the events, the statements may be entered into evidence as a past recollection recorded. "In such instances the witness has no independent testimony of the recorded information, but actually vouches for the accuracy and veracity of the record. The witness swears to the truth and accuracy of his habits in recording information." State v. Tharp, 284 So.2d 536, 542 (La.1973). A past recollection recorded should be allowed in only after the court satisfies itself that the statement was contemporaneous with the event and that the witness can verify the statement's accuracy. Primeaux v. Kinney, *714 256 So.2d 140 (La.App. 3d Cir.1971), writ refused, 260 La. 1065, 258 So.2d 87 (1972).
A prior inconsistent statement may be entered into the evidence to impeach a witness. A party may impeach its own witness only if it is taken by surprise. LSA-R.S. 15:487-88. The prior inconsistent statement cannot be offered to show its truth or veracity, but only to show that the statement was made. A jury instruction to this effect must be given if requested by the defendant, otherwise it is waived. The statement is only allowed to attack the credibility of the witness. State v. Williams, 445 So.2d 1171 (La.1984).
The witness, Ms. Woody, had difficulty remembering a conversation she had had with the defendant the day after the shooting. The prosecution tried to refresh her memory by allowing her to review a statement, concerning her conversation with defendant, which Ms. Woody had made to the police two days after her conversation with defendant. Reviewing the statement did not revive Ms. Woody's recollection of the conversation. At that point she was still unable to testify from memory.
The prosecutor can enter the statements into evidence as a past recollection recorded if Ms. Woody verifies the accuracy of the statements:
"[A.D.A. Harson] Q. Okay. Do you remember talking to him [Detective Trahan] about the meeting that you and Mrs. Montgomery had had on New Year's Day?
[Ms. Woody] A. I'm sure I mentioned it.
Q. Okay. Do you recall him recording or taking a tape recording of what y'all were talking about?
A. That's true.
* * * * * *
Q. Now I'm not trying to cut you off, but first of all, let me get it straight. Does this appear to be a copy of the transcript of that statement with Detective Trahan?
A. Well, it would be really hard for me to tell.
Q. All right. Now I'm going to the very next answer on Page Fourwell, the question: `Okay, she didn't tell you anything about what happened to the bottle of wine?' Answer: `She said thatuh, she doesn'tshe grabbed it. She had it in her hand, but she cannot remember how the bottle got broken.' Do you recall her telling you anything about that?
A. Unh-unh. I'm sure she did, if I repeated it to Trahan. But she couldn't remember.
Q. Well, that's not thewhat I'm asking you is do you recall telling Detective Trahan this?
A. Chances are I did.
Q. Okay. And if you told Detective Trahan that Mrs. Montgomery had told you this, would that be a factual statement? Do you recall her telling you when she was at your house on New Year's Day that she had grabbed the bottle and she had it in her hand, but she didn't remember how the bottle got broken?
A. I can't recall.
Q. Well, let me ask you this: Do you ever recall telling Detective Trahan anything that would not have been correct or true, as best as you knew it?
A. Oh, I told him the truth, as far as I was concerned. To the best of my ability, anyway.
Q. And if Detective Trahan were to testify that this statement was taken by him from you and that the contents of this statement were accurate as to what you told him at the time, would you have any reason to say that wouldn't be true?
A. Well, it would be his word against mine. I couldn't argue that, could I?
Q. But if he said that you told him that, do you have any knowledge at this time that would say that you didn't tell him that?
A. If I can't remember."
*715 The prosecutor and defense counsel later stipulated that the testimony of Detective Trahan, the police officer who took Mrs. Woody's statement, would be to the effect that the transcribed statement was accurate. Thus, the trial judge reasonably concluded that the statement was accurate at the time it was made; therefore, properly admissible under the past recollection recorded exception.
The statement was also admissible as a prior inconsistent statement. Eventually, Ms. Woody testified at trial that defendant did not tell her anything about how a sherry bottle was broken or about how Dr. Montgomery was shot. In her statement to the police, Ms. Woody said that Ms. Montgomery did discuss those things with her. The prosecutor timely claimed surprise and was allowed to read from the relevant portions of Ms. Woody's statement. These prior inconsistent statements are admissible to impeach Ms. Woody under LSA-R.S. 15:487. The defendant is entitled to a limiting instruction regarding the use of the statement, but must request such a statement from the court. Williams, 445 So.2d at 1179; State v. Kimble, 375 So.2d 76, 79 (La.1979). The defense must request the limiting instruction, or she will have waived her objection. Defendant did not request such an instruction and the trial court is not free to comment on the evidence without such a request. Williams, 445 So.2d at 1179. There was no error in reading from the pertinent sections of the police report without a limiting instruction.

ASSIGNMENTS OF ERROR NOS. 7 AND 8
The appellant claims the trial court erred in allowing Glenn Larkin to testify as an expert medical witness because Dr. Larkin had not been licensed by the Louisiana Board of Medical Examiners as required by LSA-R.S. 37:1284. Appellant argues that since Dr. Larkin did not possess a license to practice medicine, he could not qualify as a medical expert.
Section 1284 provides that an unlicensed physician shall not be allowed to testify as a medical expert in any court. In Jones v. LaBarbera, 342 So.2d 1125 (La.App. 2d Cir.), writ denied, 341 So.2d 1130 (La.1977), the court considered the phrase "licensed physician" to mean licensed by the State of Louisiana.
Dr. Larkin testified that he had never been unconditionally licensed to practice medicine by the Louisiana Board of Medical Examiners. However, Dr. Larkin had been issued a temporary permit to practice as a forensic pathologist at the Lafayette Parish Coroner's Office. The certificate states that it is valid "from March 15, 1983 until the results of the June, 1983 FLEX exam are announced." At the bottom of the certificate is a handwritten note, dated August 2, 1984, signed by R.B. Thompson, the coroner of Lafayette Parish, saying that the permit was extended until further notice and terminated August 10, 1984. The prosecution also presented a letter, dated August 10, 1984, in which the Louisiana Board of Medical Examiners nullified Dr. Larkin's permit as of that date. Dr. Larkin testified that the permit was reissued in August, 1983. He also testified that he had a valid temporary certificate at the time he performed the autopsy. A temporary certificate, issued under LSA-R.S. 37:1275, allows one to practice medicine in Louisiana; this satisfies the requirements of LSA-R.S. 37:1284.
Appellant also complains that the trial judge should not have qualified Dr. Larkin as an expert because he had serious flaws in his credentials. The trial court is given wide discretion in whether to qualify someone as an expert witness; that determination will not be disturbed on appeal absent a showing of manifest error. Faustina Pipe Line Co. v. Hebert, 469 So.2d 483 (La.App. 3d Cir.), writ denied, 474 So.2d 1295 (La.1985); Bateman v. Power Rig Rental Tool Co., 453 So.2d 998 (La.App. 3d Cir.1984). The court accepted Dr. Larkin as an expert based on his medical education, qualifications, and twenty years of experience. There is no manifest *716 error in the trial court's decision; thus, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 11
Appellant contends the trial court erred in allowing Sue Ellen Theriot to testify as to inculpatory statements the defendant made to her after the prosecution failed to give defendant the required notice. The defendant had requested in discovery to be notified of any statements made by defendant which the State intended to use. We find that the prosecution should have given notice to defendant of Ms. Theriot's testimony.
The prosecutor is required to inform the defendant of the existence of any statement made by the defendant if the prosecutor intends to use it at trial if the defendant has requested it. La.C.Cr.P. art. 716(B). If a party discovers new evidence which would have been subject to discovery, he must disclose that evidence to the other party and the court can modify its discovery order. La.C.Cr.P. art. 729.3. If the court discovers a party has failed to comply with a discovery order, the court may order inspection of the evidence, grant a continuance, order a mistrial, or exclude the evidence. La.C.Cr.P. art. 729.5. Failure of the State to comply with discovery does not warrant reversal unless the defendant is actually prejudiced. State v. Mitchell, 412 So.2d 1042 (La.1982).
In Mitchell, the court reversed the defendant's conviction when the prosecutor introduced into evidence a letter written by defendant to the victim's family asking forgiveness for what he had done. The prosecutor had failed to give notice of the letter to the defendant until the defendant was being cross-examined, although the prosecutor had received the letter the previous day. "Where the defendant is lulled into a misapprehension of the strength of the State's case and suffers prejudice when the defendant's statements are introduced at trial, basic unfairness which constitutes reversible error results." Mitchell, 412 So.2d at 1044.
In State v. Jones, 474 So.2d 919 (La. 1985), the court did not find reversible error when the trial court admitted statements of the defendant even though written notice was not given during discovery. However, the defendant had actual notice of the statements being offered. The prosecutor had informed the defendant verbally of the statements when the prosecutor responded to a request for exculpatory evidence. Defendant also knew that his co-conspirators, the persons to whom the defendant made the statements, had been granted immunity and were testifying for the State.
In the instant case, the prosecutor admitted that he had learned of the statements defendant made to Ms. Theriot one or two days before Ms. Theriot testified. The prosecutor did not contradict the defense attorney's claim that she had not been given notice of the use of these statements. The defense had requested discovery of any statements of the defendant which the State intended to use at trial. Defendant did not have written notice or actual knowledge of the State's intent to offer these statements into evidence, it was error to allow them into evidence. Thus, we must examine these statements closely to determine whether the error "affected substantial rights of the accused." La.C.Cr.P. Art. 921.
The uncontested portion of the record shows that Ms. Theriot was employed by Dr. Montgomery at the time of the incident and that she had worked with the defendant and victim for a year and a half. On January 2, 1984, Ms. Theriot went to the office in order to cancel patients' appointments. Defendant arrived at the office around four that afternoon, but was refused admittance by a security guard standing at the door. The witness testified that defendant had asked her to find a will in the office. At 5:15, the witness called defendant to say that she was unable to locate the will.
The objectionable portion of Ms. Theriot's testimony relates to several statements made to the witness by defendant, near the *717 time of the incident, regarding defendant's fear that Dr. Montgomery was having an affair. Ms. Theriot also described some of the methods used by defendant to verify her suspicion.
Defendant's attorney conducted a thorough impeachment of Ms. Theriot; however, defendant's attorney did not address the witness' assertion of defendant's fear of cuckoldry. The improperly admitted testimony was not so overwhelming or prejudicial as to amount to reversible error; particularly given our views as set forth under Assignment of Error No. 12(2). To phrase our finding in terms of the Chapman test (Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 [1967]), as applied to Louisiana State law in State v. Gibson, 391 So.2d 421 (La.1980), there is not a reasonable possibility that Ms. Theriot's complained of testimony might have contributed to defendant's conviction. We believe, and so declare, that the error was harmless beyond a reasonable doubt. See State v. Green, 493 So.2d 1178 (La.1986).

ASSIGNMENT OF ERROR NO. 12(1)
Appellant assigns as error the trial court's refusal to grant a post-judgment verdict of acquittal based on the unconstitutionality of the manslaughter statute, La. R.S. 14:31. Defendant claims that having manslaughter as a responsive verdict to second degree murder denies her notice of the charge against her because she will have to defend against crimes in which the killing could be intentional or unintentional. Defendant contends it would be unconstitutional to force her to defend against a charge of manslaughter which would not be a lesser included offense of second degree murder. We disagree.
It is a violation of due process to convict an accused upon a charge that was never made. Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948); State v. Booker, 385 So.2d 1186 (La.1980). Notice must be given an accused of the specific charge against him and a chance to be heard at trial of the issues raised by that charge. Id. at 1191.
Louisiana's system of responsive verdicts allows conviction of lesser offenses than the offense charged as prescribed by La.C.Cr.P. art. 814. A lesser offense is included in the charge of the greater offense if all of the elements of the lesser crime are included in the definition of the greater offense.
"Although the legislature's classification of an offense as a responsive verdict is entitled to great weight in deciding whether it is included in the charged offense, ... constitutionally the substantive elements of the crime definitions must govern in determining whether due process notice of lesser charges is included in an indictment."
Booker, 385 So.2d at 1192. In Booker, the court held that it was a violation of due process to convict a defendant of attempted second degree murder when he was not given adequate notice of the charge as he had been indicted for attempted first degree murder. At that time, first degree murder was defined as an intentional killing; second degree murder was defined solely as felony murder, i.e., an unintentional killing while perpetrating a felony.
"Since the definition of the crime of attempted first degree murder did not include the element that the offender must be engaged in perpetration of a felony at the time of the offense, an essential element of second degree murder in this case, it is plain from the definitions of the two crimes that all elements of the lesser offense were not necessarily included in the greater offense."
Booker, 385 So.2d at 1192.
In State v. Peterson, 290 So.2d 307 (La. 1974), the defendant argued that manslaughter should not be a responsive verdict to first degree murder because the requirement that the offense be committed in a sudden passion was not an element of first degree murder. The court held manslaughter to be a lesser included verdict because the sudden passion requirement was in the nature of a defense, mitigating *718 the defendant's culpability, and not an element of the crime.
In State v. Brumfield, 329 So.2d 181 (La.1976), the court said that involuntary manslaughter is a responsive verdict to second degree murder, but not in the context of the notice issue as in the instant case. The court used the statement to show that the general intent to commit one of the connected offenses to involuntary manslaughter was enough to support a conviction for manslaughter rather than requiring specific intent to kill. Brumfield, 329 So.2d at 189-90, also points out that the connected crimes of manslaughter may have the effect of reducing a charge of second degree murder to manslaughter:
"Manslaughter is a homicide which may be committed without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person. La.R.S. 14:31(2)(a). Some of the nonenumerated felonies and misdemeanors affecting the person which constitute elements of such a manslaughter conviction are aggravated criminal damage to property, La.R.S. 14:55; illegal use of weapons, La.R.S. 14:94; aggravated assault, La.R.S. 14:36; and aggravated battery, La.R.S. 14:34. These crimes, which may have the effect of reducing a charge of second degree murder to manslaughter, do not require specific intent; they are committed upon proof that the accused voluntarily did the act." (emphasis added)
In the instant case, defendant was charged with second degree murder and convicted of manslaughter. Second degree murder, La.R.S. 14:30.1, is defined as an intentional killing, or an unintentional killing committed during certain felonies. Manslaughter, La.R.S. 14:31, is defined as a killing which would be first or second degree murder but is committed in a sudden passion, or an unintentional killing committed while the perpetrator is engaged in a felony or a misdemeanor against the person. La.C.Cr.P. art. 814 makes manslaughter a responsive verdict to second degree murder. Defendant admits in her brief that the prosecution raised this possibility in its opening statement. We find that defendant had notice to defend against charges of intentional and unintentional homicide. Both second degree murder and manslaughter contain elements of intention and unintentional killings.
Sudden passion, La.R.S. 14:31(1), and the less severe crimes outlined in 14:31(2)(a), merely mitigate defendant's culpability under La.R.S. 14:30.1. See Brumfield, 329 So.2d at 190 and Peterson, 290 So.2d at 310. The trial court properly refused to grant defendant's motion for post-verdict judgment of acquittal as we find that the responsive verdict scheme to second degree murder provided defendant with adequate notice of the charges against her.

ASSIGNMENT OF ERROR NO. 12(2)
Appellant assigns as error the trial court's refusal to grant post judgment verdict of acquittal based on insufficiency of the evidence. Appellant claims that the evidence of defendant's specific intent to kill was not proved by the prosecution.
The test for sufficiency of the evidence is that a conviction must be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Shapiro, 431 So.2d 372 (La.1982).
As shown above, involuntary manslaughter is a proper responsive verdict to the charge of second degree murder. The record contains sufficient evidence to support the conviction for manslaughter. Defendant testified on her own behalf and set forth the circumstances surrounding the killing on that New Year's Eve.
Defendant testified that the victim, Dr. Montgomery, had been drinking heavily that day. The seventy-two year old victim *719 started drinking early in the morning and was described by the forty-two year old defendant as being drunk at 8:30 AM. The victim continued to imbibe throughout the day, behaving strangely and acting rudely toward defendant. At about 9:30 PM, after a couple of drinks and falling asleep while watching television, defendant woke-up to the sound of a closed car door and an empty house. Dr. Montgomery entered the house and proceeded to remove his clothing in the living room. From there he went to the refrigerator and embraced a bottle of sherry. He walked down the hall, with the bottle of sherry, to the middle bedroom and started putting on his pajama top. Mrs. Montgomery followed him and told him that she was leaving because of his drinking, citing Dr. Montgomery's earlier promise of temperance. When she opened the closet door to get her clothes, he yanked her away from the closet, slammed the door, and told her that she was not going anywhere. Mrs. Montgomery again said she was leaving and started to walk out of the room. Dr. Montgomery picked up the sherry bottle and pajama bottom and ran into the hall to block her exit. While standing in the hall, Dr. Montgomery took a drink from the sherry bottle. When he finished his sip, Mrs. Montgomery grabbed the bottle from his hands and started to pour it out in the bathroom sink. Dr. Montgomery yanked her out of the bathroom, causing her to fall against him up against the washer and dryer. Mrs. Montgomery then broke the bottle against the washer and dryer. Dr. Montgomery, five foot seven inches tall, then grabbed defendant, four foot eleven inches tall, and started choking her. She kneed Dr. Montgomery. He let her go. She backed down the hall, bumped into the chest in the hall, looked in her silver chest, and saw the gun. She picked up the gun thinking he would leave her alone if he saw the gun. She pointed the gun over his head and asked him to allow her to leave. This infuriated Dr. Montgomery; soon, he started cursing her. With gun drawn, Mrs. Montgomery walked towards Dr. Montgomery trying to get out of the house. When she got near him, he yanked her arm down, breaking a light fixture, and hit her on the head. She fell against the wall which, defendant asserts, caused the gun to discharge. When she realized Dr. Montgomery had been shot, she dropped the gun and ran to where his body folded on the floor. She called Bill Lambert. She then returned to the hall and saw that Dr. Montgomery had apparently rolled onto his other side. She covered him with a blanket. She opened the front door so the ambulance driver would be able to see the light. After she picked up several of the pieces of glass in the hall, she waited for the ambulance.
We do not find it necessary to comment on the prosecution evidence introduced to establish defendant's specific intent to kill. The evidence must indicate facts which establish beyond a reasonable doubt that manslaughter had been committed. See State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251 (La.1982), for the standard of sufficiency of evidence to responsive verdicts. In this case, defendant testified that she picked up the gun with the intention of scaring the victim. Defendant admits the gun was in her hands when it went off, but claims the shooting was accidental. Defendant's action constituted an aggravated assault, a violation of La.R.S. 14:37. An unintentional killing while perpetrating an aggravated assault, an "intentional misdemeanor directly affecting the person," is manslaughter. La.R.S. 14:31(2)(a). See State v. Tompkins, 403 So.2d 644, 649 (La.1981) (footnote no. 9); Brumfield, 329 So.2d at 189. We, as the trial judge and jury before us, find sufficient evidence of manslaughter. For these reasons, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 13
Appellant claims the trial court erred when it denied her motion for a new trial "based on the fact that the verdict statute La.C.Cr.P. art. 814 is unconstitutional in that it does not provide negligent homicide as a responsive verdict to manslaughter." Appellant's argument appears to be that since Art. 814 is unconstitutional, she could *720 not have been convicted of manslaughter since she was charged with second degree murder.
Appellant does not mention which constitutional provision Art. 814 violates, nor why or how it is unconstitutional. Although negligent homicide would appear to be a lesser included offense to manslaughter, appellant does not say why the legislature's failure to include it in Art. 814 makes the whole statute unconstitutional. Appellant does not allege that the legislature is constitutionally mandated to include every lesser included offense in the responsive verdict statute. This nebulous argument is completely lacking in supporting authority and merit.
Additionally, it is questionable whether negligent homicide is indeed always a lesser included offense of manslaughter. Negligent homicide is a death resulting from criminal negligence; whereas, manslaughter is an unintentional killing while committing a felony or misdemeanor affecting the person. To equate committing an offense to negligence is derisory. Contra Tompkins, 403 So.2d at 649 where Justice Lemmon in footnote 7 asserted that negligent homicide is a lesser grade of manslaughter, though not legislatively responsive.

ASSIGNMENT OF ERROR NO. 14
Appellant claims the trial court erred in sentencing the defendant to ten years at hard labor and an additional two years in accordance with La.R.S. 14:95.2, in that the sentence is both excessive and illegal. Appellant initially claims that the trial court's application of La.R.S. 14:95.2 (additional penalties for use of a firearm in commission of a crime) is illegal because the defendant was not charged with it in the indictment. Appellant claims that the trial court failed to articulate the mitigating factors of C.Cr.P. art. 894.1 and misstated evidentiary facts in the statement of aggravating factors. Finally, the appellant claims that the sentence of ten years is in and of itself unconstitutionally excessive.
A. In State v. Jackson, 480 So.2d 263 (La.1985) the court held that for a person to be sentenced under the provisions of La.R.S. 14:95.2 he must be charged with the offense by indictment or information. The court also held that the new rule requiring a person be charged with a violation of La.R.S. 14:95.2 will apply to all cases which have not become final upon first appellate review.
In the instant case, defendant was not charged with a violation of La.R.S. 14:95.2 although she was sentenced under it. Accordingly, in compliance with the dictates of the Jackson rule, defendant may not be sentenced to the additional two years at hard labor under La.R.S. 14:95.2. For this reason, we vacate defendant's sentence and remand for resentencing consistent with Jackson and the discussion below.
B. Appellant's next complaint is that the trial judge did not adequately articulate the mitigating factors of La.C.Cr.P. art. 894.1. The court need not articulate every aggravating or mitigating circumstance presented in Art. 894.1 for the record to adequately reflect compliance with the sentencing guidelines. State v. McDermitt, 406 So.2d 195 (La.1981). The record shows that the trial judge considered the factors of Art. 894.1. The judge, but perhaps not the jury, found that the shooting was intentional. The judge found that defendant failed to immediately call for medical help. Defendant did, or should have, understood the seriousness of her actions. The judge found that there was no provocation or justification involved noting that defendant was not injured by the victim, if ever, until after defendant drew the gun on Dr. Montgomery; further, that defendant could have withdrawn until the drunk doctor fell asleep. The trial court considered that defendant had led a law-abiding life, except for an arrest for child abuse and arrests and convictions for DWI's. The court considered letters from friends indicating that defendant was not a violent person. The trial court found that imprisonment would not entail excessive hardship to defendant or her dependants. The trial judge felt that any sentence not *721 involving imprisonment would deprecate the seriousness of the offense. Where the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). In the instant case, the trial judge articulates reasons which would be sufficient to support the sentence imposed if he knew that the jury had determined that the killing was intentional.
The record does not support the trial court's assertion that the jury found defendant guilty of intentionally killing Dr. Montgomery. In our view, the jury more likely found that the killing was accidental as a result of defendant's aggravated assault on the victim. This view is buttressed by the fact that the jury requested a clarification on the responsive verdict charge of manslaughter. The trial judge may have misstated the jury's position and projected his views for their's.
Even if the trial court correctly interpreted the jury's position, we must remand. The trial judge, in his reasons for sentencing, stated that "I have concluded that defendant is not entitled to a probationary sentence, particularly in light of R.S. 14:95.2." As found above in part A, La. R.S. 14:95.2 was improperly applied to defendant in this case. We find it necessary for the trial court to reconsider the sentence in light of the inapplicability of La. R.S. 14:95.2.
C. Appellant finally claims that the imposition of a ten-year sentence is unconstitutionally excessive. We have decided to remand this case for resentencing; therefore, this portion of the assignment is not ripe.

DECREE
For the above and foregoing reasons, defendant's conviction is affirmed, but the sentence is vacated for improperly enhancing the sentence under La.R.S. 14:95.2, and thus improperly considering La.R.S. 14:95.2 as a factor under La.C.Cr.P. art. 894.1. This case is remanded for resentencing.
CONVICTION AFFIRMED; SENTENCE VACATED AND REMANDED.