NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-70

STATE OF LOUISIANA

VERSUS

MICHAEL W. HOOD

**********
APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT,
PARISH OF VERNON, NO. 73309, DIV. B
HONORABLE JOHN C. FORD, DISTRICT JUDGE

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of Sylvia R. Cooks, J. David Painter, and David E. Chatelain,[*] Judges.

**AFFIRMED AS AMENDED.**

**Mark Kramar, Assistant District Attorney**
**Thirtieth Judicial District**
**P.O. Box 1188**
**Leesville, LA 71446**
**Counsel for Appellee:**
     **State of Louisiana**

**Peggy Sullivan, Attorney at Law**
**Louisiana Appellate Project**
**P.O. Box 2806**
**Monroe, LA 71207-2806**
**Counsel for Defendant/Appellant:**
     **Michael W. Hood**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**PAINTER, Judge.**

Defendant, Michael "Mikey" W. Hood, appeals his conviction for manslaughter, a violation of La.R.S. 14:31. For the following reasons, we affirm Defendant's conviction but amend the sentence to delete the denial of parole eligibility and instruct the trial court to make an entry into the minutes reflecting this amendment.

### FACTUAL AND PROCEDURAL BACKGROUND

Early in the morning of September 6, 2007, after an evening of drinking and ingesting various drugs, the victim, Aaron Bann, attacked Defendant with his fists. Defendant slashed the victim on the leg with a knife and stabbed him once in the chest. The victim died within minutes as a result of the stab wound to the chest.

Defendant was charged with second degree murder, a violation of La.R.S. 14:30.1, on October 22, 2007. A jury trial commenced on April 13, 2009, and on April 20, 2009, Defendant was found guilty of the responsive verdict of manslaughter, a violation of La.R.S. 14:31. On June 24, 2009, Defendant filed a "Motion for Post Verdict Judgment of Acquittal" and "Motion for New Trial." The motions were heard and denied on June 24, 2009. On that same date, Defendant was sentenced to fifteen years imprisonment, without the benefit of parole, probation, or suspension of sentence. The State further informed the trial court that it had filed a habitual offender bill against Defendant under a different docket number. This matter was heard in June of 2010 and taken under advisement by the trial court. At the time of this appeal, the disposition of the habitual offender bill was still pending in the trial court.

Defendant filed a "Motion to Reconsider Sentence," on July 24, 2009, and the motion was denied on the same date without written reasons. Defendant has now perfected a timely appeal, wherein he asserts that the State failed to meet its burden of proving that his actions were not self-defense and that the sentence imposed was an excessive sentence under the circumstances of the case. For the following reasons, we find no merit in these argument and affirm Defendant's conviction.

1

## DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. There is one error patent concerning the legality of the Defendant's sentence.

Defendant received an illegal sentence. The trial court imposed Defendant's sentence without the benefit of parole, probation, or suspension of sentence. In doing so, the trial court stated that "the statute" did not require this but noted that there was "another statute that says that will have to be served without benefit of parole, probation or suspension of sentence."

Under the portion of La.R.S. 14:31 applicable to Defendant's case, suspension of sentence, probation, and parole are not restricted. Although La.Code Crim.P. art. 893 prohibits suspension of sentence and probation for a conviction of manslaughter, it does not prohibit parole. *See* La.R.S. 14:2 (B)(4). Thus, it was improper for the court to order Defendant's sentence to be served without the benefit of parole. Accordingly, we amend Defendant's sentence to delete the denial of parole eligibility, and the trial court is hereby instructed to make an entry in the minutes reflecting the change. *State v. Batiste*, 09-521 (La.App. 3 Cir. 12/9/09), 25 So.3d 981, and *State v. Levy*, 08-1467 (La.App. 3 Cir. 6/10/09), 12 So.3d 1135.

Next, an issue regarding the sentencing delay set forth in La.Code Crim.P. art. 873 requires discussion. Louisiana Code of Criminal Procedure Article 873 requires a sentencing delay of twenty-four hours after the denial of a motion for new trial or motion in arrest of judgment unless the defendant expressly waives the delay or pleads guilty.

This court has found an express waiver occurs when defense counsel responds affirmatively when the trial court asks if he is ready for sentencing. *See State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59; and *State v. Marcotte*, 01-1586 (La.App. 3 Cir. 5/15/02), 817 So.2d 1245, *writ denied*, 02-1687 (La. 2/7/03), 836 So.2d 96.

2

On June 24, 2009, Defendant's attorney filed a "Motion for New Trial" and a "Motion for Post Verdict Judgment of Acquittal." On that same day, the motions were taken up and were denied immediately prior to the court proceeding with sentencing. After the motions were denied, the trial court did not question the parties as to whether they were ready to proceed, and there was nothing said regarding waiving the delay provided in La.Code Crim.P. art. 873. Accordingly, there was not an express waiver of the twenty-four-hour delay between the denial of the motion for new trial and sentencing, as required by La.Code Crim.P. art. 873. However, for the reasons discussed below, the facts of this case support an implied waiver of the La.Code Crim.P. art. 873 delay.

In *State v. C.S.D.*, 08-877 (La.App. 3 Cir. 2/4/09), 4 So.3d 204, this court discussed the pertinent case law and found an implied waiver of the La.Code Crim.P. art. 873 delay under similar circumstances:

> In *State v. Dronet*, 97-991 (La.App. 3 Cir. 11/4/98), 721 So.2d 1038, this court strictly applied Article 873, finding that an announcement, "We're ready," for sentencing did not constitute a waiver. The *Dronet* court, relying on *State v. Dauzat*, 590 So.2d 768 (La.App. 3 Cir.1991), *writ denied*, 598 So.2d 355 (La.1992), which was based on *State v. Augustine*, 555 So.2d 1331 (La.1990), found that the failure to abide by the delay requires a sentence to be vacated simply because the defendant challenged his sentence on appeal. *See State v. Jason*, 01-1428 (La.App. 3 Cir. 7/10/02), 820 So.2d 1286.
>
> However, in the majority of cases, this court has found an "implied waiver" analysis to be appropriate. *See State v. Schmidt*, 99-1412 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, *writ denied*, 00-2950 (La.9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002).
>
> In *State v. Giles*, 04-359, pp. 27-29 (La.App. 3 Cir. 10/6/04), 884 So.2d 1233, 1251-[52], *writ denied*, 04-2756 (La.3/11/05), 896 So.2d 62, this court found an implied waiver of the La.Code Crim.P. art. 873 delay, explaining in pertinent part:
>
>> Defense counsel voiced no objection when sentencing was taken up immediately after the denial of the motion for post verdict judgment of acquittal and the motion for new trial. After arguments were presented by the State, defense counsel argued in support of a lenient sentence, filing letters submitted on Defendant's behalf and citing to the contents of one letter in particular. Defense counsel also referred to the sentencing range and the period of time already spent in jail by the Defendant. Although the entire sentence could be imposed without benefit of

3

parole, probation or suspension of sentence, defense counsel argued that only the minimum (two years) should be imposed without these benefits.

When giving its reasons for the sentence imposed, the trial court noted that it had sat through the trial in the matter, had read the pre-sentence investigation report and had read the letters and correspondence submitted. After citing both aggravating and mitigating factors, the trial court sentenced Defendant to a lower range sentence of seventeen years at hard labor, with the first two years to be served without benefits.

In *State v. Taves*, 02-709 (La.App. 3 Cir. 1/15/03), 846 So.2d 1, *affirmed in part, reversed in part on other grounds*, 03-0518 (La.12/3/03), 861 So.2d 144, this court found a waiver of the twenty-four-hour delay, noting that defense counsel failed to voice an objection even though he was clearly aware that the sentencing was scheduled to be taken up the same day the motion for new trial would be heard. Additionally, we noted that after the trial court denied the motion for new trial and told the defendant to come up for sentencing, defense counsel declared his intent to present evidence at the hearing. In addition to presenting evidence, defense counsel argued for a suspended sentence and stated he had reviewed the PSI and discussed it with the defendant. Finally, this court noted that defense counsel did not raise as error the trial court's failure to delay sentencing and did not allege prejudice. Although this court found an implied waiver of the article 873 delay, we found the sentences imposed were excessive and remanded for resentencing. In response to the State's application for review, the supreme court reversed this court's finding of excessiveness and reinstated the sentences without any mention of the trial court's failure to abide by the delay required by La.Code Crim.P. art. 873. (*See also State v. Schmidt*, 99-1412 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, *writ denied*, 00-2950 (La.9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002), for a thorough discussion of the jurisprudence regarding express and implied waivers of the twenty-four-hour delay period required by La.Code Crim.P. art. 873).

The present case is similar to *Taves* in that the record contains no colloquy between the trial court and the Defense regarding its readiness for sentencing. However, as in *Taves*, defense counsel presented arguments to the trial court in support of a lenient sentence and the trial court supported the sentence imposed with ample reasons. Unlike the defense counsel in *Taves*, the defense counsel in the present case did not present evidence at the sentencing hearing. Additionally, the record in the present case is not as clear as the record in *Taves* as to defense counsel's knowledge that sentence would be imposed immediately after the disposition of his motion for new trial and motion for post-verdict judgment of acquittal.

However, Defendant here makes no claim of prejudice because of the failure to abide by the delay. Considering these facts, we find *Taves* analogous and find an implied waiver occurred in the present case.

Recently, in *State v. Brannon*, 07-431 (La.App. 3 Cir. 12/5/07), 971 So.2d 511, *writ denied*, 07-2465 (La.5/9/08), 980 So.2d 689, this court found an implied waiver of the La.Code Crim.P. art. 873 delay where the defendant did not request a continuance of the sentencing and did not object to proceeding with sentencing. The defense presented no evidence at the hearing, but interrupted the trial court in setting forth its reasons for sentencing to request it not read a portion of the reasons based upon evidence not proven at trial. On appeal, the defendant did not assign as error the trial court's failure to abide by the La.Code Crim.P. art. 873 delay, and he did not allege prejudice.

In the present case, after the verdict was rendered, the trial court ordered a presentence investigation and set the sentencing hearing for January 7, 2008. The minute entries provide that there were two continuances of the sentencing hearing.

There is nothing in the record to indicate that defense counsel for the defendants were unaware of the date sentencing was to be taken up. Following denial of the motions for new trial and post verdict judgment of acquittal, defense counsel did not request a continuance of the sentencing and did not object to proceeding with sentencing. At the sentencing hearing, the court recessed to allow the parties to review the letters he had received. Additionally, a review of the transcript indicates defense counsel reviewed the presentence investigation reports. At the sentencing hearing, the defense called Russell Castille, the coordinator for pre-trial monitoring, who stated that the defendants were in full compliance with their pre-trial monitoring. Moreover, the defendants' attorneys submitted on behalf of each of the defendants sentencing memorandums. In his brief to this court, defense counsel does not assign the trial court's failure to delay sentencing as error and he does not allege any prejudice as a result of the error. Furthermore, the trial court supported the sentences with ample reasons. Consequently we find the facts in this case support implied waivers of the delay required by La.Code Crim.P. art. 873.

*Id.* at 209-11.

In the present case, by order dated May 7, 2009, sentencing was set for May 20, 2009. On May 18, 2009, defense counsel filed a motion to continue sentencing on the ground that he needed more time in which to submit additional materials. On that day, sentencing was continued until June 24, 2009. As noted above, Defendant filed a motion for a new trial and a motion for post verdict judgment of acquittal on June 24, 2009; both motions were addressed and denied, and the trial court immediately proceeded to sentencing. The record does not reflect any objection by Defendant or his attorney to proceeding with sentencing after the denial of the motion for new trial.

5

A comment made by the trial judge indicates that defense counsel submitted a sentencing memorandum to the court, and the court noted that it received letters from Defendant and his family and friends. Defendant very briefly addressed the court prior to sentence being imposed. The trial court supplied ample reasons to support the sentence. Finally, on appeal, defense counsel does not assign as error the trial court's failure to delay sentencing nor does she allege prejudice as a result of the failure to abide by the delay. Thus, we find that the facts of this case support an implied waiver of the delay required by La.Code Crim.P. art. 873.

*Sufficiency of the Evidence*

Defendant argues that insufficient evidence was submitted at trial to sustain a verdict of manslaughter. Defendant further argues that the State failed to meet its burden of proving that his actions were not committed in self-defense.

Pursuant to La.R.S. 14:31, manslaughter is defined, in pertinent part, as follows:

> A. Manslaughter is:
>
> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.
>
> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person. . . .

In *State v. Alexander,* 04-788, pp. 1-2 (La.App. 3 Cir. 11/17/04), 888 So.2d 401, 402, this court held:

> When reviewing the sufficiency of the evidence, appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and must determine "whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678

6

(La.1984). When a defendant claims that he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown,* 414 So.2d 726 (La.1982). Defendant argues that the State failed to carry its burden of proof on this issue. Therefore, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that he did not act in self-defense. *State v. Matthews,* 464 So.2d 298 (La.1985).

We find that the evidence was sufficient to sustain the responsive verdict of manslaughter in this case. Defendant does not deny that he inflicted the fatal wound. At the very least, Defendant committed an aggravated battery during the course of the fight, a felony not enumerated in Article 30 or 30.1, which would fall within the statutory definition of manslaughter provided in La.R.S. 14:31(2)(a). *See* La.R.S. 14:33 and 37(A), the intentional use of force or violence with a dangerous weapon. In *State v. Loston*, 03-977 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, *writ denied*, 04-792 (La. 9/24/04), 882 So.2d 1167, the victim and Loston got into a fist fight, and Loston fatally stabbed the victim. While he was charged with second degree murder, he claimed self-defense, and the jury convicted him of manslaughter. Loston argued that the evidence was insufficient to sustain the conviction. The first circuit discussed aggravated battery and aggravated assault, finding that the evidence was sufficient to sustain the conviction, as follows:

> Alternatively, defendant was in the course of committing an aggravated assault, an intentional misdemeanor directly affecting the person. Assault is an attempt to commit a battery. La. R.S. 14:36. Aggravated assault is the attempt to commit a battery while armed with a dangerous weapon. La. R.S. 14:37 A. Thus, defendant's conduct also constituted manslaughter pursuant to La. R.S. 14:31 A(2)(a). *See State v. Montgomery*, 499 So.2d 709, 719 (La.App. 3rd Cir.1986), *writ denied*, 502 So.2d 106 (La.1987). Where, as here, there is evidence that defendant had specific intent to commit a felony or an intentional misdemeanor not enumerated in Article 30 or 30.1, and a death results in the course of commission of the offense, the evidence is sufficient to support a manslaughter conviction, even if the mortal injury inflicted was accidental. *See State v. Jordan,* 00-282, pp. 14-15 (La.App. 5th Cir.10/18/00), 774 So.2d 267, 275, *writ denied,* 00-3329 (La.11/9/01), 801 So.2d 363; *State v. Clark,* 97-0359, p. 8 (La.App. 4th Cir.10/7/98), 720 So.2d 134, 138, *writ denied,* 99-0330 (La.6/18/99), 745 So.2d 617; *State v. Major*, 96-1214, p. 9 (La.App. 4th Cir.3/4/98), 708 So.2d 813, 818-819, *writ denied,* 98-2171 (La.1/15/99), 735 So.2d 647. Thus, we are satisfied that there was sufficient evidence to support defendant's

7

conviction for manslaughter, unless the homicide was justifiable because committed in self-defense.

*Id.* at 203-04.

Defendant argued at trial that he was defending himself when he stabbed the victim. He argues in brief to this court that the jury erred when it convicted him of the responsive verdict of manslaughter because the State did not offer sufficient evidence to prove that his actions were not justified. Louisiana Revised Statutes 14:20(A)(1) provides that a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."

Defendant points to the testimony of the eyewitnesses and contends that their testimonies established at trial that, after the victim consumed a large amount of alcohol and drugs, he was out-of-control and viciously attacked Defendant and that, consequently, his belief he was in imminent danger of great bodily harm, or even death, was reasonable.

> [W]hen an accused raises self-defense, the burden is on the State to prove, beyond a reasonable doubt, that he did not act in self-defense. "The determination of a defendant's culpability focuses on a two fold [sic] inquiry: 1) whether, from the facts presented, the defendant could have reasonably believed his life to be in imminent danger, and 2) whether deadly force was necessary to prevent the danger." *State v. Mills*, 04-489, p. 7 (La.App. 5 Cir. 3/29/05), 900 So.2d 953, 959, *writ denied*, 05-1470 (La.1/13/06), 920 So.2d 235. "Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the Defendant's knowledge of the assailant's bad character." *State v. Nelson*, 34,077, p. 6 (La.App. 2 Cir. 12/6/00), 775 So.2d 579, 584.
>
> While there is no requirement that the accused must retreat from the confrontation, the possibility of escape is a factor to be considered in determining if the accused had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Woodhead,* 03-1036 (La.App. 5 Cir. 1/27/04), 866 So.2d 995, *writ denied,* 04-598 (La.7/2/04), 877 So.2d 144.

*State v. Johnson*, 06-1263, pp.8-9 (La.App. 3 Cir. 2/7/07), 948 So.2d 1229, 1234-35, *writs denied,* 07-467 (La. 10/12/07), 965 So.2d 398 and 07-509 (La. 10/12/07), 965 So.2d 399.

Two Vernon Parish Sheriff's Office deputies, Todd Scott and Jamie Johnson, witnessed the beginning of the fight in the parking lot of the Spot Lounge. Deputy Scott testified that he and Deputy Johnson were parked catercorner to the lounge watching for a patron for whom they had an arrest warrant. Deputy Scott was looking at the front door of the lounge with binoculars. At approximately 1:30 to 1:45 a.m., a group of people, including the victim, exited the lounge, followed shortly after by Defendant and two females. The victim and Defendant had words. They then all went back into the lounge. Within a few minutes, Defendant and the two females came out of the lounge and walked a short distance to a car, a Chevy Malibu, and stood by the car. The victim and his friends came out of the lounge. Deputy Scott testified that the victim was yelling and pointing his finger at Defendant and was being held back by a couple of his friends. Defendant was pointing and yelling back at the victim. Deputy Scott said that when he saw the victim run around the car and up behind Defendant swinging, he dropped the binoculars and that he and Deputy Johnson jumped into their unit and proceeded directly to the lounge.

By the time the deputies arrived at the lounge, which took no more than a few minutes, the victim was laying on the ground, and the Chevy Malibu was backing out of the parking space. Deputy Scott testified that everyone was "yelling and screaming and pointing–pointed at us that–stop that car." Deputy Johnson testified that he ordered the driver of the Chevy Malibu to pull back into the parking space. Two females were in the front seats, and Defendant was in the back seat. The deputy testified that when Defendant got out of the car, he said that he "didn't have no dealings with that guy on the ground over there."

The deputies testified that the victim was unresponsive, and, after the paramedics arrived and determined that the victim had been stabbed, they searched the Chevy Malibu for a possible weapon but found nothing that could have caused the wound inflicted on the victim.

Ronald Wiggins, the lead detective with the Vernon Parish Sheriff's Office, testified that a few days later, however, one of the females who was with Defendant

9

admitted that she hid the knife on her person and gave it to someone to hide the next day. The knife was retrieved shortly thereafter from where it had been stashed in the woods.

Detective Wiggins conducted a taped interview with Defendant that was played for the jury. The interview may be summarized as follows: Two girls, Jennifer Young and a friend, whom he did not know, picked him up at his home a little after midnight and they went to the Spot Lounge. There they had a few drinks, played a little pool, and then decided to leave. As they walked out of the lounge, "all the dudes jumped me. . . .They knocked me in the head. I don't even–still don't remember nothing." Defendant told the deputy that four or five "dudes" jumped him. He had no idea who they were or why they jumped him. He said they knocked him "plum cuckoo." He did not remember stabbing anyone and claimed he did not have a knife. He told the detective that the next thing he remembered was being at the police station.

Jennifer Young testified that she has known Defendant for several years and that he was a good friend of her fiancé. On the night of the fight, she and a friend, Heather Clemons, went out for a girls' night-out in Clemons' Chevy Malibu. They had already visited a few bars when Defendant began calling and asking her to come and get him. He called several times. Shortly after they had arrived at the Spot Lounge at approximately 12:30 a.m., Defendant called again; the two girls picked him up and returned to the Spot Lounge. She testified that they had a few more drinks. She did not see Defendant have any arguments or confrontations with anyone inside the lounge. When the bar closed, she walked outside. Defendant and Clemons had already left the lounge. As she walked out, she saw Defendant fighting with someone. "They were just kind of in this bear hug." She said she went up to the two men and pulled on Defendant's shirt and told him "to come on," but he pushed her away. She went over to the car where Clemons was standing and got into the car. Within a few minutes, Defendant jumped into the back seat and told us "you need to get out of here." He then tossed a knife into the front seat and told her to get rid of

it. She tucked the knife into the waistband of her pants. She said that Clemons tried to back the car out of the parking space, but the police made them stop and get out of the car. The next day she gave the knife to her brother-in-law and told him to hide it. However, the following day, she admitted that she had hidden the knife and told the police to whom she had given the knife.

Lelin Porter, a friend of the victim, testified that Defendant silently but insidiously provoked the victim by smiling at him with "a grill[1] in his mouth." He stated that he was out bar hopping with the victim, a few other friends, and the victim's uncle, Raymond Bann, on the night of the fight. They arrived at the Spot Lounge around 1:45 a.m. Porter testified that he did not know Defendant prior to that night, but that Defendant kept grinning at the victim in a way that meant "have it on your mind because I'm going to get you." He testified that he and the victim went outside the bar "[t]o get away from the drama," and Defendant came out while speaking on his phone and stated "yeah, I just called my boys and they're coming up here to beat y'all up and Aaron, you know, me and Aaron." He testified that "they" had to calm the victim down because he wanted to fight with Defendant right there and then. He said that Defendant kept talking to the victim, cussing at him, and finally, suddenly, they ran toward each other and "clashed." They fell to the ground with the victim on top. Porter testified that he could see a knife clipped to Defendant's pants, that Defendant then pulled the knife, and that he saw Defendant "jug two times." He said that he ran over and attempted to help the victim, but Defendant cut him on the arm. While Porter testified that the victim did not carry a knife, he stated that the victim had been arrested for fighting on other occasions. He also described the victim as being six-foot-one-inch tall and weighing approximately one hundred eighty pounds.

Doctor Shawn Granger, an orthopedic surgeon and coroner for Vernon Parish, examined the victim's body and documented his death. However, James Taylor, a

---

[1]Porter interpreted "grill" as meaning that gold teeth, when flashed, signaled that the fight was on.

forensic pathologist at Louisiana State University, performed the autopsy on the victim. Doctor Taylor testified that the four, almost five, inch deep stab wound to the chest was the cause of the victim's death. He also testified that, according to the toxicology report, the victim had a blood alcohol content of .159, a very high level of alprazolam, otherwise known as Xanax, and tetrahydocannibinol (marijuana), in his system. While both doctors testified that Xanax normally acts as a "disinhibitor" and a relaxant, they both agreed that a "paradoxical" effect could take place when high amount of Xanax, like that found in the victim's system, is coupled with other drugs, such as alcohol and marijuana, and cause aggressive behavior as opposed to relaxation.

The victim's uncle, Raymond Bann, testified that he accompanied the victim to the Spot Lounge around 1:15 a.m. to wait for the victim's girlfriend to get off work from the strip bar next door to the lounge. They had been drinking at various bars before arriving at the Spot Lounge. He remembered seeing Defendant in the lounge, but he did not know him prior to the morning of the fight. At first he stated that he did not see any transactions between the victim and Defendant inside the bar. However, later he testified that inside the lounge Defendant provoked the victim by staring at him. Around 1:45 a.m., he went outside and sat in the car for about ten minutes because he was getting "pretty drunk" and had also ingested Xanax. Although Bann testified that he kind of "blacked out" in the car and did not see the beginning of the fight, he remembered seeing Defendant walk out of the lounge and stand by a car. He remembered seeing "Big Mike" Kunzel holding on to the victim. The next thing he remembered was seeing his nephew stumble and grab a girl around the waist and then fall.

"Big Mike" Kunzel testified that he had known the victim for about six months, that they had become good friends and often partied together. On the night of the fight, he was driving home around 1:30 a.m. when he saw Raymond Bann's car outside the Spot Lounge and decided to stop. He said that as soon as he walked into the lounge he could feel tension. He said he knew most of the people in the lounge,

except for Defendant. He stated that outside of the lounge he held the victim back from fighting with Defendant. Once the victim calmed down they all went back inside the lounge, but the victim "was going off at the mouth."

Kunzel's testimony indicated that, when they all went back outside, the victim began saying "like, what you looking at" – trying to say it in different terms. "I'll beat you up," things like that. Kunzel said that Defendant was walking back and forth between two cars. When the victim assured Kunzel that he was not going to do anything, Kunzel let go of him and turned to talk to someone, and suddenly heard a "punch." He turned and ran around to the car where Defendant had been standing. Defendant was on the ground with the victim standing over him, swinging down at him, "[l]ike jabbing straight down, up and down." When asked what Defendant was doing, Kunzel said, "defending himself." He testified that he heard the police sirens and turned away, and when he turned back, the victim was laying on the ground. He stated that he thought the victim had overdosed because the victim had told him earlier that he had taken seven Xanax pills that night. Finally, Kunzel testified that he was not at all surprised by the fight, stating that it was not unusual for the victim to get into fights.

Heather Urban, who was a bartender at another bar, was at the Spot Lounge the morning of the fight. She stated that she did not know Defendant prior to the fight, but she knew the victim, who had visited her bar almost every night for the past several months. She saw no aggression between the victim and Defendant inside the lounge. She stated that when the lounge closed, she walked outside and saw the victim "[b]eating the crap out of him, [Defendant]," with "[h]is fists and his feet." She said that when she turned away and was getting into her car, the victim grabbed her back, then fell to the ground. She thought he had overdosed because he was drinking a lot and had "taken a bunch of pills."

As noted, Defendant argues that there was no evidence submitted which demonstrated that he had any other option but to defend himself with deadly force. He points to the fact that the victim was noted for fighting and had consumed so

much alcohol and Xanax that his friends all assumed that he had overdosed. The State, however, argues in brief that Defendant cannot avail himself of the affirmative defense of self-defense pursuant to La.R.S. 14:21, which provides:

> A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.

While the State tentatively admits Defendant may not have been the "aggressor" in this case, the State argues that he was the one who brought the "difficulty" upon himself by flashing his "grill" at the victim and staring at him in such a way as to mean that he was going to get the victim. The State further points to Porter's statement that when the "drama" got so bad, he and the victim went outside, and then Defendant came outside and told them he had just called his boys and "they're coming up here to beat y'all up."

Of all the testimonies, Porter's was most equivocal. According to Porter, he was at the victim's side every step of the way, even though the victim's uncle barely remembered Porter as being there. Further, Porter stated that he had to help hold the victim back from fighting, although Kunzel testified that the victim's uncle had asked him to hang on to the victim because the uncle was too intoxicated to do so himself and that he restrained the victim alone. Moreover, Porter testified that the two men ran at each other and "clashed" together. However, Deputy Scott, who was watching from across the street, testified that the victim escaped from being held back when everyone looked away, ran around the cars and up behind Defendant, and swung at him from behind. Kunzel testified that the victim ran up on Defendant and caught him off guard. Finally, Deputy Johnson testified that Porter went to the hospital after the ambulance left and raised such a commotion after he was not allowed to see the victim that he was arrested for disturbing the peace.

There was no indication that the victim and Defendant men knew each other. None of the victim's friends admitted knowing Defendant prior to this incident. There was no testimony or any indication that Jennifer Young or Heather Clemons

14

knew the victim. There was no testimony given that hinted at what the animosity was between the two men, other than Porter's testimony that Defendant smiled menacingly at the victim and Raymond Bann's testimony that Defendant stared at the victim. On the two occasions that the two men were outside the lounge together, testimony established that they were each exchanging words and that it was the victim who had to be held back to keep him from attacking Defendant. We find that there was insufficient evidence to establish who was the aggressor or who caused the difficulty in this situation, thus precluding Defendant from successfully arguing self-defense.

As noted above, factors to be considered when analyzing a claim of self-defense and whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the moment, the possibility of force or violence short of killing, the defendant's knowledge of the character of the victim, and whether escape was possible. Moreover, the absence of a weapon from the victim is a critical element of the prosecutor's proof. *State v. Mincey,* 08-1315 (La.App. 3 Cir. 6/3/09), 14 So.3d 613. In *Mincey,* the defendant was charged with second degree murder after he repeatedly bumped against the victim as he walked into and out of the bar. He argued self-defense, and the jury convicted him of manslaughter. Outside the bar, the victim and two friends confronted the defendant, and as the victim swung at him, the defendant pulled a gun and shot him. He argued that he was backed into a corner and surrounded by the victim's friends. This court "recognize[d] that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable"; however, this court found that "responding to an oncoming punch by shooting the other person in the chest [was] an excessive response." *Id.* at 615-16. Further, it was noted that the absence of a weapon on the victim was not necessarily dispositive of the issue.

In the current case, there was no indication of what the problem was between the two men. Testimony established that all that action took place in a very short

15

period of time, approximately between 1:15 a.m. and 1:45 a.m. Angry words were exchanged between the two men on the two occasions outside the lounge. It was established that the victim had to be held back by friends on each occasion. While Defendant had a knife, there was no evidence that the victim was armed with any weapon.

Although there was testimony that the victim was a fighter, there was no testimony or other evidence to indicate that Defendant was aware of the victim's pugilistic nature. However, to support his assertion that he had reason to be afraid for his life, Defendant points to the testimonies given by Randall Willet and Ben Pollock, paramedics with the Acadian Ambulance Service. Willet and Pollock both testified that the victim had an "obvious deformity of angulation" of the right wrist, possibility indicating that the wrist had been broken during the fight. Defendant argues that he had no options. He was on his back on the ground while the victim punched and kicked him, and the victim was so out-of-control that even though the victim's wrist was broken, the victim still continued to pummel him. While neither doctor who had examined the victim's body had seen an obviously broken wrist, the paramedics testified that when the victim was placed on the stretcher and strapped in for transportation to the hospital, the fracture could have been reduced. The doctors testified that they had no reason to examine the victim's wrists. When asked, the victim's uncle testified that he was not aware of any prior injury or deformity to the victim's wrist.

Further, although there was dubious testimony that Defendant had called his "boys" to come and beat up the victim, it was Defendant who was surrounded by the victim's friends during the beating. Finally, testimony established that Defendant's knife was clipped to his pants at the time he hit the ground.

In *Loston,* 874 So.2d 197, the victim and the defendant argued inside the house, and were told to take it outside. Testimony established that the defendant armed himself with a kitchen knife on the way out of the house. The first circuit noted:

In this case, the defendant armed himself with a knife before leaving the Colar residence, in obvious anticipation of some kind of confrontation with the victim. No physical confrontation occurred inside the residence and there is no evidence that the defendant was in imminent danger when he armed himself and went outside. Numerous witnesses testified to what went on inside and outside of the Colar residence. No one testified that the victim threatened the defendant with death or great bodily harm. Once outside, the defendant did not try to withdraw from the confrontation.

. . . .

As the triers of fact, the jurors were free to accept or reject, in whole or in part, the testimony of any witness. *State v. Johnson*, 99-0385, p. 9 (La.App. 1st Cir.11/5/99), 745 So.2d 217, 223, *writ denied*, 00-0829 (La.11/13/00), 774 So.2d 971. In this case, the jurors obviously did not choose to believe the defendant's claim of self-defense. They may have determined that the aggressor doctrine applied, since the defendant escalated the conflict by arming himself with a knife without having been threatened and before going outside to continue a dispute. Alternatively, they may have determined that the defendant did not reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm at the time he stabbed the victim, and did not act reasonably under the circumstances, particularly since the victim was unarmed and the fight was a one-on-one confrontation with many bystanders. Either of these determinations was reasonably supported by the evidence, viewed in a light most favorable to the prosecution. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. *State v. Glynn,* 94-0332, p. 32 (La.App. 1st Cir.4/7/95), 653 So.2d 1288, 1310, *writ denied,* 95-1153 (La.10/6/95), 661 So.2d 464. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded the State proved beyond a reasonable doubt that the defendant's conduct was not justified.

*Id.* at 204-05.

On the second occasion that the two men were outside, Defendant was standing by the Chevy Malibu when the victim and his friends exited the lounge. Defendant could have gotten into the vehicle to escape the victim. Instead, he continued to angrily exchange words until the victim ran over to him. As noted, there is no unqualified duty to retreat; however, the possibility of an escape is a factor to be looked at when determining whether deadly force was necessary to avoid harm. *Johnson,* 949 So.2d 1229. Further, Defendant's subsequent actions did not comport with that of a man who believed he had acted in self-defense. As soon as the victim moved away, Defendant ran to the car and attempted to flee. He gave the knife to Jennifer Young and told her to hide it. It was evident he was aware of the fact the

17

victim was down when, as he exited the vehicle, he told the deputy that he had no dealings with the man on the ground. He told the deputy at the police station that he was jumped by three or four men, that he did not have a knife, and that he did not stab anyone.

We find that the jury was correct when it discarded the charge of second degree murder as the evidence does not establish the specific intent to kill the victim or to impose great bodily harm as required by statute. The jury correctly determined that mortal injury was inflicted by accident, but that the State sustained its burden of proof that Defendant did not act reasonably under the circumstances, particularly since the victim was unarmed.

## *Excessiveness of Sentence*

Defendant argues that, considering the circumstances of the case, the sentence of fifteen years is nothing more than needless and purposeless imposition of pain and suffering. The manslaughter statute provides for a range of imprisonment of up to forty years. La.R.S. 14:31(B). Defendant was sentenced to a little more than one-third of the potential sentence.

To determine whether a sentence is constitutionally excessive, this court has stated:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling,* 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied,* 01-838 (La. 2/1/02), 808 So.2d 331.

Moreover, in *State v. Smith,* 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied,* 03-562 (La. 5/30/03), 845 So.2d 1061, this court held that in order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, the following factors may be considered:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith,* 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste,* 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook,* 95-2784 (La.5/31/96); 674 So.2d 957, 958.

At the sentencing hearing, after the trial court noted that it had considered letters from both the victim's family and Defendant's family, and after reiteration of the facts of the case, the trial court stated:

> The Court in examining the sentencing guidelines finds that the following provisions apply: B(9) that is, the kind of injury the defendant–the victim sustained. In this case it was the ultimate loss, that of his life. B(10) there was a weapon used, it was a knife. Those are the two circumstances the Court must consider as being aggravating. Mitigating, B (24, 25, and 26) clearly the victim, Bann, was the aggressor in causing the altercation which induced or facilitated the defendant's criminal conduct. The Court finds that the defendant acted under strong provocation. Where two persons are attacking one the defendant's conduct could be justified though failing to establish a defense for it. The defendant in B (28)–the defendant has no prior convictions of violent or assaultive behavior. Both of his prior convictions were in the nature of theft charges. (31) the hardship imposed on the defendant is certainly incarceration and deprivation of his children of the support that they had previously enjoyed by him. Those are the factors the Court has considered in addition to the letters that I mentioned and the statement that Mr. Hood made about–and I believe that he is sorry for what happened. I believe he exhibited remorse right after the incident. I base that on the testimony of his cell mate about his conduct in the cell. Be that as it may, this defendant is a third felony offender and the Court believes that a lesser sentence than I'm going to impose would deprecate the seriousness of this defendant's conduct.

Defendant filed a motion to reconsider the sentence which was denied without written reasons. In the motion, as in brief, Defendant argued that the sentence was

excessive since the victim was the aggressor and viciously attacked Defendant from behind and as established by testimony, the victim was standing over him, beating him, and Defendant had no means of escape.

While the trial court did not order a pre-sentence investigation report, the record indicates the trial court had been informed regarding Defendant's family, work history, and criminal history. The trial court stated that it received and read letters from Defendant's family, noting Defendant had children, and was supporting them and was employed prior to the incident. The trial court noted that Defendant had two prior felonies but that neither was a crime of violence. The trial court then listed mitigating and aggravating factors that were taken into consideration. Our review of the record indicates that the trial court took adequate cognizance of the sentencing considerations set out in La.Code Crim.P. art. 894.1.

Defendant argues that the trial court seemed to be very sympathetic to his position. He states:

> The Trial Court found as aggravation the fact a death resulted and a knife was used. Appellant would argue it is not an aggravating factor that a death occurred-it is an element of the offense. In mitigation the Trial Court found Aaron Bann was clearly the aggressor, Mikey acted under strong provocation, Mikey had no prior convictions for assaultive behavior and that a hardship would be imposed on his family. Further, the Trial Court believed Mr. Hood was remorseful for his conduct.

Defendant argues that the trial court imposed an excessive sentence under the circumstances of the case.

In *State v. Johnson,* 94-1523 (La.App. 3 Cir. 5/3/95), 657 So.2d 178, *writ denied,* 95-1397 (La. 11/3/95), 662 So.2d 9, this court affirmed a twenty-year sentence for manslaughter. The defendant and a group of friends were standing outside the defendant's house when a vehicle stopped and the driver asked the men if they knew a certain person and also asked for forty dollars. The defendant told the police that the victim, whom he did not know, appeared angry and reached as if he were reaching for a weapon. The defendant pulled out a gun and shot the victim. The defendant argued that the sentence of twenty years was excessive "because his actions were motivated by subjective fear for his life based on words and actions of the

victim, and because he was eighteen years old at the time of the offense with no prior convictions." *Id.* at 180. This court found no merit with the defendant's contention, stating:

> In support of its conclusion that this case was not a typical manslaughter case, but was more akin to second degree murder, the trial court stated: "This situation involves a victim here, and an assailant who didn't even know each other, and hadn't even encountered each other, except apparently within minutes before the shooting occurred. It almost has aspects of a certain arbitrariness to it, or randomness to it.... [I]t also looked like that Mr. Johnson had that pistol [in his pocket] and was just kind of anxious to do something with it since he had it. He never did say that he saw a gun in any of the information that I have.... I am just unable to see ... anything that comes to the point of heat of passion." We agree with the trial court's assessment of the case before us and find defendant's contention without merit.
>
> In this case, defendant received a twenty year sentence, which is half of the maximum sentence under the statute. The trial court stated that this is a "serious [offense] because of the youth of this defendant and his lack of any serious prior record.... It is also serious because of the death involved." Because of the youth of defendant and defendant's lack of a serious record, the trial court did not impose the maximum sentence. As discussed above, the trial court considered the lengthy presentence investigation report, that the defendant was carrying a concealed weapon which he used to commit the offense, other sentences imposed in manslaughter cases which were reduced from second degree murder, and that the manslaughter conviction was the result of a plea agreement and was not a typical manslaughter case.

*Id.* 180-81.

In *State v. Jordan,* 94-1012 (La.App. 3 Cir. 2/1/95), 650 So.2d 407, *writ denied*, 95-564 (La. 6/30/95), 657 So.2d 1027, this court affirmed a sentence of fifteen years, with five years suspended, imposed for a conviction of manslaughter. Jordan thought the victim, whom he saw walking in a parking lot, was the one who attempted to burglarize his home the night before. The defendant hit the victim with his car, he then jumped out of the car with a gun, they struggled, and the victim was shot dead. The defendant was charged with second degree murder, but the jury convicted him of manslaughter. The defendant argued that the fifteen-year sentence was excessive. This court noted that to find the sentence excessive it had to find that the sentence was so disproportionate to the severity of the crime that it shocked this court's sense of justice. This court found that under the circumstances of the case, "defendant's sentence of 15 years, five of those being suspended, makes a measurable

contribution to acceptable penal goals and does not shock one's sense of justice." *Id.* at 413.

We find that the sentence of fifteen years does not shock this court's sense of justice. Moreover, as noted in the Error Patent section, Defendant is parole eligible and is subject to diminution of sentence. La.R.S. 15:571.3(A)(1). The availability of early release may be considered when reviewing sentences for excessiveness. *State v. Green,* 418 So.2d 609 (La.1982). Accordingly, the trial court did not abuse its vast discretion when it sentenced Defendant to fifteen years imprisonment. There is no merit to this assignment of error.

## DECREE

For all of the foregoing reasons, we find that the evidence was sufficient to sustain the responsive verdict of manslaughter. Furthermore, we do not find the sentence imposed to be excessive; however, the sentence is amended to delete the denial of parole eligibility, and the trial court is hereby instructed to make an entry into the minutes reflecting this amendment.

**AFFIRMED AS AMENDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal, Rule 2-16.3.

22